**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY JOHNSON and DARRYL MOORE, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 16-cv-06776 |
| DIAKON LOGISTICS, et al., | ) ) | Judge Andrea R. Wood |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Timothy Johnson and Darryl Moore worked as delivery drivers for Defendant Diakon Logistics ("Diakon"). While working for Diakon, Plaintiffs preformed deliveries exclusively for Defendants Innovel Solutions, Inc. (formerly known as Sears Logistics Services, Inc.) and Sears Roebuck and Co. (collectively, "Sears"). Plaintiffs have brought this action alleging that Diakon, Diakon's President and Chairman William Jarnagin, Jr., as well as Diakon's Vice President of Operations Todd Voda (collectively, "Individual Defendants"), and Sears violated the Illinois Wage Payment and Collection Act ("IWPCA") by making unlawful deductions from Plaintiffs' wages. Plaintiffs also allege that Diakon and Individual Defendants were unjustly enriched. Now before this Court are Diakon's motion to dismiss (Dkt. No. 44), Sears's motion to dismiss (Dkt. No. 68), and Individual Defendants' motion to dismiss (Dkt. No. 73). Also before this Court are Diakon's motion to strike section III of Plaintiffs' sur-reply[1] or, in the alternative, for leave to file a response (Dkt. No. 81) and Plaintiffs' motion for leave to file a response *instanter* (Dkt. No. 87) to Diakon's motion to strike.

---

[1] Plaintiffs filed their sur-reply (Dkt. No. 76) in opposition to Diakon's motion to dismiss (Dkt. No. 44).

# BACKGROUND

The following facts alleged in Plaintiffs' Second Amended Complaint ("SAC") are accepted as true for purposes of the instant motions.

Diakon provides delivery services for companies such as Sears. (SAC ¶ 17, Dkt. No. 40.) Plaintiffs worked as delivery drivers for Diakon. (*Id.* ¶¶ 3, 4.) Diakon required its delivery drivers (including Plaintiffs) to sign an agreement[2] drafted by Diakon, which stated that drivers were independent contractors. (*Id.* ¶ 19.) Despite their characterization as contractors, Diakon required its drivers to report to its facilities in the morning for at least five days per week, to wear uniforms when making deliveries for Diakon, and to complete their delivery routes in a specific order and within specific time windows set by Diakon. (*Id.* ¶ 20.) If drivers failed to complete their deliveries in the order specified by Diakon, they would be subject to discipline. (*Id.*) Diakon also retained the right to terminate drivers for any reason. (*Id.*) Plaintiffs and other drivers depended on Diakon for their work; they did not perform delivery services for anyone else while working for Diakon, did not negotiate with Diakon's customers regarding the rates charged for their service, and did not contract with Diakon's customers independently. (*Id.* ¶ 23.)

Diakon deducted certain expenses from Plaintiffs' wages, including deductions for insurance, any related insurance claims, truck rentals, and uniforms; Diakon also required Plaintiffs to provide safety deposits for their trucks (*Id.* ¶¶ 24, 25.) In addition, Diakon deducted the costs of any damaged goods or damage to the customer's property when it deemed that a

---

[2] In the SAC, Plaintiffs allege that they signed the agreement with Diakon. (SAC ¶ 19, Dkt. No. 40.) And in its motion to dismiss, Diakon references the signed agreements with Plaintiffs ("Service Agreements"), which are attached as exhibits to the motion. (*See* Exs. 1 and 2 to Diakon's Mem. in Supp. to Mot. to Dismiss, Dkt. Nos. 45-1, 45-2.) Plaintiffs do not dispute the existence or authenticity of the Service Agreements. Thus, the Court may consider the agreements without converting Diakon's motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d), as the agreements are referenced in Plaintiffs' complaint and are central to their claims. *See Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 692 F.3d 580, 591 (7th Cir. 2012).

delivery was performed in an unsatisfactory manner. (*Id.* ¶ 26.) These deductions varied from paycheck to paycheck, and Diakon did not obtain Plaintiffs' freely given express written consent for such deductions at the time the deductions were made. (*Id.* ¶ 28, 29.) Diakon also required Plaintiffs and other drivers to incur other expenses, such as motor vehicle authorization costs and vehicle maintenance costs. (*Id.* ¶ 30.)

At the time of the events at issue in this case, Jarnagin was President and Chairman of Diakon and its highest-ranking executive. (*Id.* ¶¶ 6, 31.) He appeared as a signatory on a number of Diakon's contracts with clients, which governed the compensation received by Diakon for delivery services and, in turn, the compensation received by drivers for those services, and which often encompassed such items as deductions. Jarnagin was also in charge of financial matters at Diakon, including payroll. (*Id.* ¶ 31.) Voda was Diakon's Vice President of Operations and a member of Diakon's executive leadership team. (*Id.* ¶¶ 7, 32.) In his position as Vice President, as well as in his previous role at Diakon, Voda had first-hand involvement with various issues relating to Diakon's delivery drivers, including their compensation and various deductions from their pay. (*Id.* ¶ 32.)

Sears provided delivery services to its customers through an arrangement with Diakon. (*Id.* ¶ 33.) Sears had warehouses throughout Illinois, and Diakon maintained offices and supervisory personnel at the Sears warehouses in order to make home deliveries to Sears customers. (*Id.* ¶ 34.) A number of Diakon drivers, including Plaintiffs, made deliveries exclusively for Sears while working for Diakon. (*Id.* ¶ 35.) Sears required Plaintiffs and other drivers to report every morning to the Sears warehouse to pick up the products to be delivered that day and provided drivers with a daily manifest specifying what products needed to be delivered, where the products needed to be delivered, and the time frames within which such deliveries had

to be performed. (*Id.* ¶ 36.) Sears also required Plaintiffs to maintain regular contact with its personnel throughout the day for additional delivery instructions and mandated certain deductions from Plaintiffs' paychecks for such things as insurance. (*Id.*) If a Sears customer had a complaint regarding a delivery or damage, only Sears was permitted to investigate the complaint; if it determined that delivery was unsatisfactory, Sears would require Diakon to make deductions from the driver's paycheck. (*Id.* ¶¶ 36, 41.) Sears also required delivery trucks to have the Sears logo on them; drivers making deliveries for Sears had to wear Sears uniforms and carry Sears business cards, and they were not allowed to have non-Sears merchandise on their trucks. (*Id.* ¶¶ 36, 38.)

Plaintiffs have brought this action on behalf of themselves as well as a putative class of other similarly-situated drivers, alleging that Diakon and Individual Defendants violated the IWPCA (in particular, 820 ILCS 115/9) by making unlawful deductions from Plaintiffs' and the other class members' wages (Count I). (*Id.* ¶¶ 49–56.) Plaintiffs also allege that Diakon and Individual Defendants were unjustly enriched by misclassifying drivers as independent contractors and thereby evading employment-related obligations such as social security contributions, workers' compensation coverage, and state disability and unemployment compensation, and forcing drivers to pay work-related expenses, such as the costs of purchasing or leasing vehicles meeting Diakon's specifications and the costs of operating, insuring, and maintaining those vehicles (Count II). (*Id.* ¶¶ 57–60.) Finally, Plaintiffs claim that Sears violated the IWPCA (820 ILCS 115/9) by making unlawful deductions from drivers' wages (Count III). (*Id.* ¶¶ 61–66.)

**DISCUSSION**

## I.    Diakon's Motion to Dismiss

Diakon asks this Court to dismiss Plaintiffs' claims against it under the IWPCA and for unjust enrichment, pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Factual allegations that are merely consistent with a defendant's liability, conclusory statements, and formulaic recitations of the elements of a cause of action are, by themselves, insufficient. *Iqbal*, 556 U.S. at 678. In analyzing a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in favor of the plaintiff. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

### A.    FAAAA Preemption Issue

Diakon argues that Plaintiffs' claims under the IWPCA and for unjust enrichment are preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), in particular, 49 U.S.C. § 14501(c).

Preemption is an affirmative defense. *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010). Thus, as the party raising it, Diakon bears the burden of proof. *See Fifth Third Bank ex rel. Tr. Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). Procedurally, the proper way for Defendants to proceed would be first to file an answer pleading preemption as an affirmative defense and then to move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Bausch*, 630 F.3d at 561. However, this procedural error is "of no consequence" when the

Court has in front of it all it needs to be able to rule on the defense. *See Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010). And Rule 12(c) motions are reviewed under the same standard as motions to dismiss under Rule 12(b)(6). *See Pisciotta v. Old Nat. Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007). Accordingly, the Court proceeds to decide the issue as presented in the current motion.

The FAAAA was passed with the goal of deregulating the trucking industry. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1051 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 2289 (2017). It provides that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). There are two requirements for FAAAA preemption: (1) a state must have enacted or attempted to enforce a law, and (2) that law must relate to carrier rates, routes, or services by either expressly referring to or having a significant economic effect on them. *See Nationwide Freight Sys., Inc. v. Illinois Commerce Comm'n*, 784 F.3d 367, 373–74 (7th Cir. 2015). Thus, the FAAAA's preemptive scope is broad—it preempts a state law that "has a direct connection with or specifically references a carrier's prices, routes, or services," or has a "'significant impact' related to Congress's deregulatory and pre-emption-related objective." *Costello*, 810 F.3d at 1051. That said, the FAAAA's preemptive reach has its limits—laws with "tenuous, remote, or peripheral" relationship to carrier rates, routes, or services are not preempted. *Nationwide Freight Sys., Inc.*, 784 F.3d at 373.

The first requirement of FAAAA preemption is clearly satisfied here for the claims under the IWPCA and for the unjust enrichment claims. The IWPCA was enacted to provide employees with a cause of action for the timely and complete payment of earned wages or final

compensation, without employers retaliating against them. *Byung Moo Soh v. Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1107 (Ill. App. Ct. 2004). The particular provision at issue here, 820 ILCS 115/9, prohibits employers from taking deductions from employees' wages unless the deductions are: "(1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9.[3] State common law (such as Illinois law of unjust enrichment) also may satisfy the first prong of the preemption test. *See United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 607 (7th Cir. 2000) (holding that state common law satisfies the first preemptive requirement in the Airline Deregulation Act cases); *see also Georgia Nut Co. v. C.H. Robinson Co.*, No. 17 C 3018, 2017 WL 4864857, at *3 (N.D. Ill. Oct. 26, 2017) (state common-law negligence claims satisfy the first element of FAAAA preemption).

Regarding the second element of preemption, the Seventh Circuit considered a scenario very similar to the one here in *Costello v. BeavEx, Inc.* In *Costello*, the defendant, a same-day delivery service, enlisted a number of couriers to carry out customer orders throughout Illinois. 810 F.3d at 1048. The defendant classified the couriers as independent contractors instead of employees. *Id*. But the couriers alleged that they were actually employees for purposes of the IWPCA and thus deductions taken from their wages by the defendant were illegal. *Id.* At issue in *Costello* was FAAAA preemption of the second prong of the IWPCA test for what constitutes an "employee"—namely, that to treat an individual as an independent contractor, the individual must "perform[ ] work which is . . . outside the usual course of business . . . of the employer." *Id.* at 1050. Because the IWPCA is not specifically directed to motor carriers, the *Costello* court had to

---

[3] 820 ILCS 115/9 also contains three other exceptions that are not relevant here.

determine whether the IWPCA had "a significant impact on the prices, routes, and services that [defendant] offers to its customers." *Id.* at 1055. The court concluded it did not—in other words, the court held that the IWPCA was not "related to a price, route, or service of any motor carrier." *Id.* at 1057. In reaching its decision, the court noted the limited nature of the IWPCA's scope and that the plaintiffs only sought to enforce the provision prohibiting wage deductions. *Id.* at 1055. The court reasoned that the impact of the IWPCA was too "tenuous, remote, or peripheral" to warrant FAAAA preemption and that the IWPCA was the type of background labor law that only indirectly affected prices by raising costs—the law regulated a labor input and operated "one or more steps away from the moment at which the firm offers its customers a service for a particular price." *Id.*

Realizing that the natural extension of *Costello* would defeat its position here, Diakon attempts to distinguish that case. In particular, Diakon focuses on language in *Costello* rejecting a categorical rule exempting from preemption all generally applicable state labor laws, but still concluding that "the IWPCA's effect on the cost of labor is too tenuous, remote, or peripheral to have a significant impact on [defendant's] setting of prices for its consumers." *Id.* Diakon claims that its preemption argument is different from that in *Costello* because it does not contend that Plaintiffs' claims will increase its costs. Rather, Diakon argues that Plaintiffs' claims are preempted because they are attempting to use the IWPCA and common-law unjust enrichment to recover deductions that Plaintiffs' authorized in the contracts with Diakon and that such attempts are fundamentally at odds with the FAAAA's deregulatory goals of enforcing freely made agreements and would prevent competitive market forces from operating.

That argument overlooks several important points, however. First, where, as here, Congress has superseded state legislation by statute, this Court's task is to identify the domain

expressly pre-empted. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). To do so, this Court must focus first on the statutory language as the best evidence of Congress's pre-emptive intent. *Id.* The FAAAA specifies that only state laws that are "related to a price, route, or service" are preempted. 49 U.S.C. § 14501(c)(1). Thus, to be preempted, the state law or claim must "relate to" these specified categories. *See id.*; *see also Costello*, 810 F.3d at 1051. *Costello* is controlling precedent on the issue of whether the IWPCA "relates to a price."[4] And Diakon advances no argument as to why the IWPCA would "relate to a . . . route or service." Second, *Costello* provides general guidance on the issue of FAAAA preemption by emphasizing the distinction between generally applicable state laws that affect the carrier's relationship with ***its customers*** and those state laws that affect the carrier's relationship with ***its workforce***. *See Costello*, 810 F.3d at 1054. "Laws that affect the way a carrier interacts with its customers fall squarely within the scope of FAAAA preemption." *Id.* While laws "that merely govern a carrier's relationship with its workforce . . . are often too tenuously connected to the carrier's relationship with its consumers to warrant preemption." *Id.* The IWPCA falls into the second category as it affects Diakon's relationship with its workforce, not its customers. *Cf. Georgia Nut Co. v. C.H. Robinson Co.*, No. 17 C 3018, 2017 WL 4864857, *3–4 (N.D. Ill. Oct. 26, 2017) (holding that the FAAAA preempted a customer's negligent supervision and negligent hiring claim against a hired freight broker because allowing such a claim to proceed "would go beyond enforcing the parties' bargain" and "[t]he FAAAA does not allow courts to impute state-law derived rights into

---

[4] Similar to the present case, the agreements between the couriers and the defendant in *Costello* also covered various deductions. *See Costello v. BeavEx Inc.*, 303 F.R.D. 295, 299 (N.D. Ill. 2014).

transportation agreements, which would expand the bargained-for rights of the agreement").

Therefore, Diakon's argument fails.[5]

**B.      Truth-in-Leasing Regulations Preemption Issue**

Diakon next argues that Plaintiffs' claims are preempted by the Truth-in-Leasing

Regulations ("Regulations"), 49 C.F.R. § 376.1 *et seq.* The Court's preemption analysis "begins

with a presumption ***against*** preemption and focuses first on the text of the statute." *Planned*

*Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 984 (7th

Cir. 2012) (emphasis in original). Unless Congress has indicated its intent to preempt through the

express language of the statute or through the statute's structure and purpose, the state law is

presumed to be valid. *Id.* When the federal statute contains no express preemption language, an

implied preemption may be at issue. *Id.* Implied preemption encompasses "field preemption,

which arises when the federal regulatory scheme is so pervasive or the federal interest so

dominant that it may be inferred that Congress intended to occupy the entire legislative field," as

well as "conflict preemption, which arises when state law conflicts with federal law to the extent

that 'compliance with both federal and state regulations is a physical impossibility,' or the state

law 'stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress.'" *Id.*

Here, Diakon argues that the Regulations preempt Plaintiffs' claims because the

Regulations allow for certain types of deductions that Plaintiffs contend are unlawful.[6] Pursuant to

---

[5] Diakon does not advance any argument that would suggest that the unjust enrichment claims (which stem
from the alleged IWPCA violations) should not be preempted even if the IWPCA claims are preempted.

[6] Diakon makes a conflict preemption argument in its motions to dismiss. However, in its reply brief,
Diakon also argues (in a single footnote) that while the cases it relies on rest on conflict preemption, the
Regulations also "occupy the field" of the types of "lease" arrangements at issue in this case, including any
deductions made under the leases. Diakon provides no further support or explanation for its argument other
than a citation to *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 765 (7th Cir. 2008), which held that

10

49 U.S.C. § 14102(a), the Secretary of Transportation is authorized to issue regulations that govern owner-operator leases of equipment to authorized carriers. The Regulations promulgated pursuant to this section are found in 49 C.F.R. § 376.1 *et seq.* The Regulations clarify the responsibilities of authorized carriers and drivers, and thereby prevent carriers from using informal leases with owner-operators to circumvent safety regulations and responsibility for injuries to third-parties. *Shimko v. Jeff Wagner Trucking, LLC*, No. 11-CV-831-WMC, 2013 WL 10075919, at *2 (W.D. Wis. June 28, 2013) (listing cases that discuss the goals of the Regulations). The Regulations also protect owner-operators by requiring carriers to enter into written leases with certain mandatory terms. *Id.* In particular, the Regulations require "a written lease granting the use of the equipment" for "the authorized carrier [to] perform authorized transportation in equipment it does not own." 49 C.F.R. § 376.11. The Regulations define a lease as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." 49 C.F.R. § 376.2(e). And § 376.12 specifies what this written lease has to contain:

> (c) Exclusive possession and responsibilities.

> (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease. . . .

---

the Railway Labor Act preempts the Illinois Minimum Wage Law under the doctrine of field preemption. As stated above, federal preemption is an affirmative defense and, as such, Diakon bears the burden of proving it. A footnote mentioning in passing that the doctrine of field preemption might apply does not suffice.

(d) Compensation to be specified. The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease. . . . The compensation stated on the lease or in the attached addendum may apply to equipment and driver's services either separately or as a combined amount.

(e) Items specified in lease. . . . The lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items. . . .

(j) Insurance.

(1) The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage . . . . If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.
. . .

(3) The lease shall clearly specify the conditions under which deductions for cargo or property damage may be made from the lessor's settlements. The lease shall further specify that the authorized carrier must provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.

49 C.F.R. §§ 376.12(c)(1), (d), (e), (j). The Regulations also specify that they do not affect whether the driver is an independent contractor or an employee:

Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4).

Plaintiffs allege that Diakon made deductions for insurance, insurance claims, truck rentals, uniforms, and costs associated with unsatisfactory deliveries, and also required Plaintiffs to provide a safety deposit for their trucks. Diakon argues that Plaintiffs' claims related to the deductions for acquiring and maintaining trucks are preempted by 49 C.F.R. §§ 376.12(c)(1), (d), and (e), which supposedly allow carriers and contractors to enter into agreements under which the

contractors provide vehicles to the carrier and the carrier to allocate those expenses to the contractor, and that Plaintiffs' claim for reimbursement of insurance costs is preempted by 49 C.F.R. § 376.12(j)(1). Furthermore, Diakon contends that Plaintiffs' claim for reimbursement of cargo and property damage payments are preempted under 49 C.F.R. § 376.12(j)(3).

Contrary to Diakon's assertions, however, the Regulations do not conflict with Plaintiffs' claims for deductions here. To begin, the Court does not read the Regulations as providing for the deductions at issue in all trucking contracts in general. It is clear from the plain language of the Regulations that they simply require that, if certain arrangements are made between an owner-operator and a carrier, those arrangements should be included in the written lease. For example, the subsection that deals with insurance states: "***If*** the authorized carrier ***will make a charge back*** to the lessor for any of this insurance, ***the lease shall specify*** the amount which will be charged-back to the lessor." 49 C.F.R. § 376.12(j)(1) (emphasis added). This regulation does not say that a charge back for insurance is allowed under all circumstances, including those in the present case. Instead, it simply contemplates that a driver and a carrier might agree to a charge back provision and, if so, the provision should be spelled out in their lease. *See Toro v. CSX Intermodal Terminals, Inc.*, No. 1485-CV-00973 B (Worcester Sup. Ct. June 16, 2017) (holding that the Regulations do not necessarily preempt or dictate the relationship between a carrier and a driver, but rather only require that many pertinent terms of employment be set forth in writing in a lease). Similarly, the subsection dealing with the cargo damage deductions mandates that the lease "clearly specify ***the conditions*** under which deductions for cargo or property damage ***may be made*** from the lessor's settlements." 49 C.F.R. § 376.12(j)(3) (emphasis added). It does not say that such deductions are always proper—rather, it simply states that if such deductions are agreed to, the conditions for deductions should be specified in the lease. *Id.* And while 49 C.F.R.

§§ 376.12(c)(1), (d), and (e) certainly contemplate the possibility of an agreement between a driver and a carrier under which the contractors provide vehicles to the carrier and the carrier allocates certain expenses to the contractor, there is nothing in those subsections to indicate that certain agreements and deductions are always valid. For example, § 376.12(d) states that while the driver's compensation may be expressed "as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease" and that it "may apply to equipment and driver's services either separately or as a combined amount," it must be specified in the lease. 49 C.F.R. § 376.12(d). Likewise, § 376.12(e) contemplates that a driver-carrier might agree to split the costs of "fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portion of such items" in various ways, but requires that the lease "clearly specify the responsibility of each party with respect to [such] cost[s]." 49 C.F.R. § 376.12(e).

Even if the Court were to read the Regulations as affirmatively permitting the application of the deductions that the Regulations require to be specified in the lease, there does not appear to be any conflict between the Regulations and the IWPCA regarding the deductions at issue in the present case. The IWPCA allows employers to make deductions from employees' wages or final compensation as long as the deductions are "made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Thus, there is no reason why an employer such as Diakon could not comply with both the Regulations and the IWPCA. The IWPCA also does not stand as an obstacle to the accomplishment and execution of the Regulations' objectives. To the contrary, the IWPCA's restriction on unconsented deductions is consistent with the objective of the Regulations to protect truck drivers from exploitative

practices by carrier companies. *See Shimko*, 2013 WL 10075919, at *2 (describing goals of the Regulations).

This Court does not find any of the cases cited by Diakon in support of its preemption argument to be persuasive. *See Valadez v. CSX Intermodal Terminals, Inc.*, No. 15-CV-05433-EDL, 2017 WL 1416883 (N.D. Cal. Apr. 10, 2017); *see also Remington v. J.B. Hunt Transp., Inc.*, No. CV 15-10010-RGS, 2016 WL 4975194 (D. Mass. Sept. 16, 2016). Aside from the fact that they are not controlling precedent for this Court, the cited cases differ from the present case because the state laws in those cases specifically prohibited the actions that the courts found to be affirmatively permitted by the Regulations. In particular, in *Valadez*, California Labor Code § 2802 required an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." *Valadez*, 2017 WL 1416883, at *9. The *Valadez* court found that the plaintiffs' claims for reimbursement of expenses associated with acquiring and maintaining vehicles were preempted by 49 C.F.R. § 376.12(c)(1) and (d), which the court found to expressly contemplate that carriers and drivers could enter leases by which the drivers would provide their vehicles to the carriers. *Id.* The *Valadez* court also found that the plaintiffs could not seek reimbursement for fuel and maintenance because those claims were preempted by § 376.12(e), which the court found to expressly permit carriers and drivers to enter leases allocating these expenses to the drivers; that plaintiffs' claims for insurance reimbursements were preempted by § 376.12(j)(1), which the court read as allowing such reimbursements; that plaintiffs' claims for cargo and property damage were preempted by § 376.12(j)(3), which the court found to permit leases to specify conditions under which deductions for such damage would be made from the driver's settlements; and that the plaintiffs' claims for escrow funds were preempted by § 376.12(k). *Id.* at *9–10. California

Labor Code § 221, also at issue in *Valadez*, prohibited an "employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." *Id.* at *11. The *Valadez* court found that the plaintiffs' claims under that section were preempted by the same regulations as discussed above for California Labor Code § 2802. Likewise, in *Remington*, the court found that, "[i]f the Massachusetts Independent Contractor Statute and Wage Act were to be interpreted to require a carrier, such as [the defendant], to bear the entirety of the expense associated with an equipment lease," those state laws would be preempted by the Regulations, which the court found to permit allocation of such expenses to drivers. *Remington*, 2016 WL 4975194, at *5. But here, the IWPCA does not prohibit consented-upon deductions.[7] Therefore, Diakon's argument is unavailing.[8]

## C. Plaintiffs' Express Consent to Deductions under the IWPCA

As noted above, the IWPCA does not prohibit deductions "made with the express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9(4). Diakon argues that Plaintiffs' IWPCA claims should be dismissed because Plaintiffs expressly consented to the deductions by signing their Service Agreements. But the SAC alleges that "Diakon did not get Plaintiffs' and other class members' freely given express written consent at the time it made deductions from their pay" and that "[t]he deductions taken by Diakon per

---

[7] The parties also dispute whether the Regulations apply to this case at all. Plaintiffs argue that the Service Agreements between them and Diakon are not "leases" within the meaning of the Regulations. In their sur-reply, Plaintiffs argue that even if the Court interprets the Service Agreements as leases within the meaning of the Regulations, the agreements are void *ab initio* as contravening the IWPCA and Illinois public policy as well as invalid under the Regulations. (Pls.' Sur-Reply at 4–5, Dkt. No. 76.) Because the Court rejects Diakon's preemption argument for the reasons indicated above, the Court does not need to resolve these additional issues. As such, the Court denies Diakon's motion to strike section III of Plaintiffs' sur-reply or, in the alternative, for leave to file a response (Dkt. No. 81) as moot. Plaintiffs' motion for leave to file a response *instanter* (Dkt. No. 87) to Diakon's motion to strike is also denied as moot.

[8] As with its FAAAA preemption arguments, Diakon does not advance any argument that would suggest that the unjust enrichment claims (which stem from the alleged IWPCA violations) should not be preempted even if the IWPCA claims are preempted.

paycheck were not for a uniform amount, but rather varied with each paycheck." (SAC ¶¶ 28, 29, Dkt. No. 40.) At the pleading stage, this is sufficient.

In arguing to the contrary, Diakon relies on *Osorio v. Tile Shop, LLC*, No. 15 C 15, 2016 WL 316941 (N.D. Ill. Jan. 27, 2016), which held that the plaintiff authorized deductions from his paycheck because he signed an agreement authorizing such deductions. *Id.* at *2. However, the plaintiff in *Osorio* "knew exactly how much of each paycheck he would be required to give up," which is quite different from the situation here. *See id.*; *see also Bell v. Bimbo Foods Bakeries Distribution, Inc.*, No. 11 C 03343, 2013 WL 6253450, at *5 (N.D. Ill. Dec. 3, 2013) (holding that the contested deductions were authorized by the plaintiff because he signed an agreement that authorized deductions of a particular amount and the actual deductions never exceeded the specified amount). The Illinois Administrative Code, which is part of a set of regulations implementing the IWPCA, supports the distinction between the deduction of known amounts and the deduction of unknown amounts. It provides that:

> a) Any written agreement between employer and claimant permitting or authorizing deductions from wages or final compensation must be given freely at the time the deduction is made. In the case of cash advances, the agreement may be made either at the time of the deduction or at the time of the advance itself.
>
> b) When a deduction is to continue over a period of time and the written agreement provides for that period of time, ***provides for the same amount of deduction each period*** and allows for voluntary withdrawal for the deduction, the agreement shall be considered to be given freely at the time the deduction is made.

56 Ill. Admin. Code tit. § 300.720 (emphasis added). The regulations support the idea that a proper consent entails the employee having some idea what the actual deductions would be. Thus, Diakon's argument is unpersuasive.

### D. Incorporation Issue for Johnson's IWPCA claims

Diakon also argues that Plaintiff Johnson's claim under the IWPCA must be dismissed because there is no contract between him and Diakon entitling him to wages—instead, it is EZ Techniques, Inc., Johnson's corporation, that had the direct contractual relationship with Diakon.

The statute Diakon allegedly violated here, 820 ILCS 115/9, prohibits "deductions by employers from wages or final compensation" unless such deductions meet certain criteria specified by the statute. The IWPCA defines "wages" narrowly as "any compensation *owed an employee by an employer pursuant to an employment contract or agreement* between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2 (emphasis added). Similarly, "final compensation" is defined as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation *owed the employee by the employer pursuant to an employment contract or agreement* between the 2 parties." *Id.* (emphasis added). As such, to state a claim under the IWPCA, a plaintiff "must plead that wages or final compensation is due to him or her as an employee from an employer under an employment contract or agreement." *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1058 (Ill. App. Ct. 2005); *see also Enger v. Chicago Carriage Cab Corp.,* 812 F.3d 565, 568 (7th Cir. 2016).

The IWPCA provides an employee with remedies more expansive than a common law breach of contract action, as it uses the words "employment contract or agreement." 820 ILCS 115/2; *see also Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004). Illinois courts have interpreted the term "agreement" to be broader than a contract and to require only a manifestation of mutual assent. *See Zabinsky*, 807 N.E.2d at 671; *see also Enger v. Chicago Carriage Cab Co.*, 77 F. Supp. 3d 712, 716 (N.D. Ill. 2014). This is because "[t]o require an

employee to have a valid, enforceable contract before invoking the Act would render the Act surplusage." *Zabinsky*, 807 N.E.2d at 671. Thus, under the IWPCA, "an employment agreement can be entirely implicit" and "employers and employees can manifest their assent to conditions of employment by conduct alone." *Landers-Scelfo*, 827 N.E.2d at 1058–59.

Here, in essence, Diakon argues that the existence of the written agreement between EZ Techniques, Inc. and Diakon negates the possibility of any agreement between Johnson and Diakon regarding Johnson's wages, even at the motion to dismiss stage. But a formal agreement between the parties is not required under the IWPCA. Read in the light most favorable to Plaintiffs, it is reasonable to infer from the allegations in the SAC that Johnson and Diakon agreed on Johnson working for and being paid by Diakon. It might be that the parties settled on an option of having such payments going through the company that Johnsons owned. But at the pleading stage, Diakon's argument that its agreement with an entity that Johnson owned precludes Johnson's claims under the IWPCA is not a winning one.

### E. Whether Unjust Enrichment Claim Fails due to Plaintiffs' Service Agreement

To state a claim for unjust enrichment, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that such retention violates the fundamental principles of justice, equity, and good conscience. *See Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992); *see also Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012). "The theory of unjust enrichment is based on a contract implied in law." *Hartigan*, 607 N.E.2d at 177. Because unjust enrichment is based on an implied contract, the doctrine has no application where there is a specific contract which governs the relationship of the parties. *Id.* Hence, a party may not bring a claim for unjust enrichment unless the contract is invalid or fails to cover the claim. *See Enger*, 812 F.3d at 571; *see also Karimi v. 401 N. Wabash Venture, LLC*, 952

N.E.2d 1278, 1285 (Ill. App. Ct. 2011). "In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004). The reason for prohibiting an unjust enrichment claim between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract. *Id.* Thus, while a plaintiff may plead claims alternatively based on an express contract and unjust enrichment, "the unjust enrichment claim cannot include allegations of an express contract." *Gagnon*, 983 N.E.2d at 1052.

Here, the SAC alleges that there is an agreement in place between Plaintiffs and Diakon. (SAC ¶¶ 19, 20, Dkt. No. 40.) In their unjust enrichment claim, Plaintiffs do not allege that the agreement is invalid or that the claims fall outside of the agreement's terms.[9] As a result, Plaintiffs' unjust enrichment claim against Diakon must be dismissed. *See, e.g.*, *Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964, 978–79 (N.D. Ill. 2008) ("To the extent Plaintiff is attempting to plead unjust enrichment . . . to do so he must allege the absence of a valid contract."). The dismissal is without prejudice, however, as Plaintiffs may be able to amend their complaint to address this deficiency.

## II.     Sears's Motion to Dismiss

Sears also asks this Court to dismiss Plaintiffs' claim against it under the IWPCA pursuant to Rule 12(b)(6). Sears argues that this claim must fail because Plaintiffs do not allege the existence of any contract or agreement between Plaintiffs and Sears requiring Sears to pay wages.

As explained above, to state a claim under the IWPCA, a plaintiff "must plead that wages or final compensation is due to him or her as an employee from an employer under an

---

[9] Plaintiffs argue that the Service Agreement was invalid for the first time in their sur-reply. (Pls.' Sur-Reply at 4–5, Dkt. No. 76.)

employment contract or agreement." *Landers-Scelfo*, 827 N.E.2d at 1058; *see also Enger*, 812 F.3d at 568. Here, the SAC describes the contract between Plaintiffs and Diakon, as well as the arrangement between Sears and Diakon. For example, the SAC alleges that Diakon "purports to contract with individuals, such as Plaintiffs, to drive a delivery truck and to deliver merchandise to customers' homes" and "require[s] its delivery drivers to sign an agreement drafted by Diakon, which state[s] that they [a]re independent contractors." (SAC ¶¶ 17, 19, Dkt. 40.) The SAC further alleges that Sears and Diakon have an arrangement, under which Diakon delivers Sears merchandize to its customers' homes, that Diakon maintains an office and supervisory personnel at certain Sears warehouses, and that "[a] number of Diakon drivers, including Plaintiffs Johnson and Moore, performed deliveries exclusively for Sears during their time working with Diakon." (*Id.* ¶¶ 33–35.) Furthermore, Sears retained control over Plaintiffs by, among other things, requiring them to report every morning to the Sears warehouse to pick up the products to be delivered, to have regular contact with Sears' personnel throughout the day for additional delivery instructions, and to have Sears insignia on their trucks, uniforms, and business cards. (*Id.* ¶ 36.) According to Plaintiffs, if Sears determined that a delivery had been made in an unsatisfactory manner, Sears would require Diakon to deduct the damage costs from Plaintiffs' pay checks. (*Id.* ¶ 41.)

However, the SAC is silent as to the existence of any direct agreement between Plaintiffs and Sears, let alone a direct agreement to pay wages to Plaintiffs, and Plaintiffs outright admit that there is no direct agreement between them and Sears. (Pls.' Opp'n at 1, Dkt. No. 77.) Therefore, it would seem that Plaintiffs have not sufficiently alleged a claim under the IWPCA against Sears. *See, e.g.*, *Enger*, 812 F.3d at 569 (holding that the plaintiffs' IWPCA claims fail because they had

not demonstrated that the defendants owed them "wages"). The Court's analysis does not stop here, however, as Plaintiffs insist that Sears and Diakon are joint employers.

Joint employer liability is allowed by the IWPCA. *Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 903–04 (Ill. 2005). An "employee" is not limited to only one "employer" for IWPCA purposes. *Id.* at 903. The test for the existence of joint employers is whether "two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." *Id.* at 904. To determine whether a defendant is a joint employer, courts look at factors including the role of the defendant in hiring, firing, promotions, demotions, setting wages, work hours, and other terms and conditions of employment, discipline, and actual day-to-day supervision and direction of employees on the job. *Id.*

Sears appears to believe that, even if it is a joint employer, it still must have a separate agreement with Plaintiffs for payment of wages and that Plaintiffs' agreement with Diakon for payment of wages (and Diakon's additional agreement with Sears) would not suffice.[10] It is certainly true that an employee suing under the IWPCA must seek to collect compensation owed by his employer, not third parties. *Enger*, 812 F.3d at 569. But Sears misunderstands the doctrine of joint employment—it is not simply that an employee might have more than one employer, each with a separate contract; it is a doctrine of joint liability for several employers under the same employment arrangement. *See id.* at 903–04; *see also Spates v. Roadrunner Transp. Sys., Inc.*, No. 15 C 8723, 2016 WL 7426134, at *4 (N.D. Ill. Dec. 23, 2016) (whether defendants are "joint employers" under the IWPCA determines whether plaintiffs may sue both for violation of the statute). Thus, "[p]ayment of employees is not one of the factors courts need consider in

_____

[10] Sears assumes, for the purpose of its motion to dismiss, that it is Plaintiffs' employer. (Mem. of Law in Supp. of Mot. to Dismiss at 4 n. 2, Dkt. No. 69.)

determining whether there is joint employment." *Gross v. Sec. Assocs. Int'l, Inc.*, No. 09 CV 3095, 2009 WL 3837435, at *7 (N.D. Ill. Nov. 17, 2009).

Here, Plaintiffs point to various factors that Sears allegedly controlled with respect to Plaintiffs' employment—from setting their daily delivery schedule and requiring contacts throughout the workday to requiring that deductions be made from Plaintiffs' paychecks. Thus, Plaintiffs sufficiently plead that Sears is a joint employer.

### III.    Individual Defendants' Motion to Dismiss

Individual Defendants have moved to dismiss Plaintiffs' claims against them under the IWPCA and for unjust enrichment (Counts I and II) for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).[11]

A complaint need not include facts alleging personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). However, once the defendant moves to dismiss the complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction. *Id.* The precise nature of the plaintiff's burden depends on whether an evidentiary hearing has been held. *Id.* When the district court holds an evidentiary hearing to determine jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Id.* But where, as here, the court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction. *Id.* In

---

[11] Individual Defendants also have moved to dismiss claims against them under Rule 12(b)(6), arguing that these claims are wholly derivative of the claims brought against Diakon and thus should be dismissed for the same reasons as articulated in Diakon's motion to dismiss. Individual Defendants further contend that the unjust enrichment claims against them fails because there is no basis to pierce the corporate veil to hold them liable for Diakon's alleged violations. The Court does not need to reach these issues, however, as Plaintiffs' claims against Individual Defendants are dismissed for lack of personal jurisdiction.

evaluating whether the *prima facie* standard has been met, disputes regarding relevant facts presented in the record are resolved in the plaintiff's favor. *Id.*

Individual Defendants argue that they do not have sufficient contacts with Illinois to warrant this Court's exercise of personal jurisdiction over them. "A federal court exercising diversity jurisdiction has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction."[12] *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 855 n.2 (7th Cir. 2011). To determine whether personal jurisdiction exists over Individual Defendants in Illinois, the Court must consider the Illinois long-arm statute, the Illinois constitution, and the federal constitution. *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 760–61 (7th Cir. 2008). The Illinois long-arm statute's "catch-all" provision provides that a court may "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). Thus, the "catch-all" requirements are co-extensive with the state and federal constitutional requirements. *Id.*; *Citadel Grp. Ltd.*, 536 F.3d at 761.

The Due Process Clause of the Fourteenth Amendment prevents a state from exercising personal jurisdiction over a defendant, unless the defendant had "certain minimum contacts" with the state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In other words, "each defendant must have purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Id.* (quoting *Burger King Corp. v.*

---

[12] Plaintiffs have brought their case under the Class Action Fairness Act. (SAC ¶ 13, Dkt. No. 40.) Thus, standards applicable to diversity cases apply here. *Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 578 (7th Cir. 2017) ("CAFA expands jurisdiction for diversity class actions by creating federal subject matter jurisdiction if" certain requirements are met).

*Rudzewicz,* 471 U.S. 462, 473 (1985)). The nature of contacts with the state determines whether personal jurisdiction exists; it also controls jurisdictional scope (whether it is general or specific jurisdiction). *Id.* The general jurisdiction threshold is high—"the contacts must be sufficiently extensive and pervasive to approximate physical presence." *Id.* For specific personal jurisdiction, "the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction;" thus, courts must "evaluate specific personal jurisdiction by reference to the particular conduct underlying the claims made in the lawsuit." *Id.* The exercise of specific personal jurisdiction is appropriate where "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* at 702. The exercise of such jurisdiction "must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause." *Id.*

Plaintiffs argue that this Court has specific personal jurisdiction over Individual Defendants.[13] It is not the case that the exercise of the specific personal jurisdiction over officers and directors of a company that operates within the forum state is always appropriate. *See, e.g.*, *Farmer v. DirectSat USA, LLC*, No. 08-CV-3962, 2010 WL 380697, at *8 (N.D. Ill. Jan. 28, 2010) (holding that the plaintiffs' generalized allegations that the three corporate officers of the parent company had authority over the employees of the company for which the plaintiffs worked were insufficient to establish personal jurisdiction). It is also not the case that allegations that high-ranking officers knowingly permitted a company to violate the IWPCA are always sufficient to justify the exercise of personal jurisdiction over those officers. *See Allman v. McGann*, No. 02

---

[13] Although Plaintiffs do not use the words "specific personal jurisdiction," it appears that their arguments are directed at thebased on specific jurisdiction rather than general jurisdiction, and Plaintiffs do not argue that Individual Defendants had extensive and pervasive contacts with Illinois sufficient to approximate physical presence as required for general jurisdiction. (*See* Pls.' Opp'n at 4–5, Dkt. No. 80.)

C 7442, 2003 WL 1811531, at *3–5 (N.D. Ill. Apr. 4, 2003) (collecting cases dealing with the IWPCA and the issue of personal jurisdiction over non-resident officers and directors of corporations,and holding that there was no personal jurisdiction over the defendant vice president who allegedly knowingly permitted his company to violate the IWPCA but who had only few contacts with Illinois). Rather, some additional link to the forum state is needed. *See, e.g.*, *Farmer*, 2010 WL 380697, at *9 (holding that allegations that the three high-ranking officers of the company for which the plaintiffs worked had authority to institute wage and hour policies, and supervised and directed employees in conjunction with their role in starting Illinois office of the company were sufficient to establish specific jurisdiction).

The parties here have not submitted any affidavits in support of their positions. But in the SAC, Plaintiffs allege the following regarding Individual Defendants:

> 1. . . . Plaintiffs [] contend that Defendants William C. Jarnagin, Jr. and Todd E. Voda are individually liable by virtue of their roles with Diakon, and their permitting Diakon's unlawful deductions.
> . . .

> 6. Defendant William C. Jarnagin, Jr. . . . is Diakon's President and Chairman.

> 7. Defendant Todd E. Voda . . . is Diakon's Vice President of Operations.
> . . .

> 31. As president and chairman of Diakon, Jarnagin is the highest-ranking executive at Diakon. Jarnagin appears as a signatory on a number of Diakon's delivery contracts with furniture and appliance companies, which govern the compensation received by Diakon for delivery services, and, in turn, the compensation received by drivers for those services, and often encompass such items as deductions. Jarnagin is also in charge of financial matters at Diakon, including payroll.

> 32. Defendant Voda is a member of Diakon's executive leadership team. In his position as Diakon's Vice President of Operations, as well as in his previous role as in his role as "Director of Operations for the SLS group," which he began in 2011,[] Voda has had firsthand involvement with various issues related to Diakon's delivery drivers, including their compensation and various deductions from their pay.
> . . .

52. At all relevant times, Jarnagin and Voda were employers of Plaintiffs and the proposed class as defined by the IWPCA.

. . .

55. Jarnagin and Voda violated the IWPCA, 820 Ill. Comp. Stat. 115/9, by permitting and directing Diakon to make unlawful deductions from Plaintiffs' and the proposed class' wages.

. . .

60. By misclassifying its employees as "independent contractors," and by requiring those employees to pay its expenses, Diakon, Jarnagin, and Voda have been unjustly enriched.

(SAC ¶¶ 1, 6, 7, 31, 32, 52, 55, 60, Dkt. No. 40.) Thus, the SAC only provides a general description of Individual Defendants' roles and responsibilities within Diakon. And while Plaintiffs argue that Individual Defendants, as Diakon executives, "approved the delivery and service contracts negotiated with ***Illinois companies***, which affected ***Illinois residents***" (Pls.' Opp'n at 5, Dkt. No. 80 (emphasis added)), the SAC does not actually contain such allegations. Instead, the SAC simply states that Jarnagin was "a signatory on ***a number of Diakon's delivery contracts*** with furniture and appliance companies" and Voda "had firsthand involvement with various issues related to ***Diakon's delivery drivers***, including their compensation and various deductions from their pay," with no information provided on whether Jarnagin signed any contracts with Illinois companies that would impact Illinois drivers or whether Voda took any actions regarding Illinois delivery drivers. (SAC ¶¶ 31, 32, Dkt. No. 40 (emphasis added).) The SAC contains no information on whether Jarnagin took any action that impacted Illinois employees or had any relation to Plaintiffs' alleged injuries. The SAC is also silent as to whether Jarnagin was a signatory to Diakon's contract with Sears.

Plaintiffs' opposition to the motion to dismiss does not shed any light on this issue either. It only states:

> This Court has personal jurisdiction over Defendants Jarnagin and Voda as Diakon
> executives who approved the delivery and service contracts negotiated with Illinois
> companies, which affected Illinois residents. Dkt, 40, ¶¶ 17-18, 20. For example,
> Sears, one of Diakon's largest customers, has its corporate headquarters in
> Illinois;[] Plaintiffs performed deliveries to Illinois customers out of the Sears
> warehouse in Romeoville. Dkt. 40, ¶¶ 9, 17-18.

(Pls.' Opp'n at 5, Dkt. No. 80.) Thus, the SAC provides no information from which the Court

could infer any involvement of these Individual Defendants in Plaintiffs' agreements with and

services for Diakon. The SAC also alleges that Diakon is a Delaware corporation with its

headquarters and principal place of business in Virginia, which conducts business in Illinois.

(SAC ¶ 5, Dkt. No. 40.) Thus, there is nothing to suggest that Diakon's executives are located in

Illinois. As a result, the allegations in the SAC are insufficient to justify the exercise of personal

jurisdiction over Individual Defendants. As a result, Plaintiffs' claims against Individual

Defendants are dismissed.[14]

---

[14] Individual Defendants also argue that this Court lacks personal jurisdiction over them on the basis of the
fiduciary shield doctrine. This Court does not need to reach that issue, however, as the claims against
Individual Defendants are dismissed on alternative grounds.

## CONCLUSION

For the reasons stated above, Diakon's motion to dismiss (Dkt. No. 44) is granted in part and denied in part. The motion is granted only to the extent that it relates to Plaintiffs' claims for unjust enrichment against Diakon; those claims are dismissed without prejudice. Individual Defendants' motion to dismiss for lack of personal jurisdiction (Dkt. No. 73) is also granted and those claims are also dismissed without prejudice. Diakon's motion to strike section III of Plaintiffs' sur-reply (Dkt. No. 81) and Plaintiffs' motion for leave to file a response (Dkt. No. 87) are denied as moot. Sears's motion to dismiss (Dkt. No. 68) is denied. Plaintiffs are granted leave to amend their complaint to attempt to cure the pleading deficiencies discussed in this Memorandum Opinion and Order.

ENTERED:

Dated:  March 28, 2018

_____
Andrea R. Wood
United States District Judge